Case number 08-3052. People v. Tyrone Everhart. Good morning, Your Honors. My name is Robert Hirshhorn. I'm with the Office of the State Appellate Defender, and I'm here this morning representing the defendant, Tyrone Everhart. And I promise you I will not use the phrase now, a genuine issue of material fact. As the Court's familiar, this case, Mr. Everhart was charged with aggravated criminal sexual assault. He received a natural life sentence on that. On appeal, we've raised a host of issues. For today, really, I want to focus, if I can, and devote my time, to the first two issues. First, whether Mr. Everhart was deprived of the effective assistance of trial counsel, or trial counsel made a promise to the jury that he was unable to fulfill. Not unusual, right? A promise made and not kept is not an unusual situation, at least in recent times. Would you say that's true? Well, I'm assuming this is a reference to the Governor's trial. I couldn't help but reference that reference. I was going to make reference to it myself at some point, Your Honor. Yes, I mean, it does happen. But let me point out several things when we talk about this just being some kind of common occurrence. We're not talking about promising the jury that some witness, some technical witness, some witness at the circumstantial level. We're talking about the defendant here. He tells this jury, this guy, my client, is going to take the stand. He normally says he's going to take the stand, but he makes specific promises as to what he's going to cover for this jury. As defense counsel, do you find that – where do you think that promise originates? Your Honor, there's only two ways to look at this. Effective counsel, competent counsel, if he's going to do that in opening statement, he has to talk to his client first. The state makes almost a fetish of the idea that this is a decision that only the defendant can make. As we said in our reply, we don't dispute that at all. But before you make a promise of this nature, something so important, your client is going to get up there and testify. He's going to testify to this laundry list of things that he enumerates for the jury. First, you've got to go to your client. Well, the list was basically consent. The list was more than consent, Your Honor. But wasn't it going to be that – I mean, I think it was consent because he said he's going to get on the stand. He's going to say that there was sexual conduct, but it wasn't forced sexual conduct. He did suggest that they knew each other before and that there had been a prior relationship. Yes. And he also said he's also going to explain to you what this statement was. All right, because he did make an admission. Yes. All right. So all of that, all of that, the consent defense, the challenge to his statement, all of that would presuppose that he would be taking the stand. Absolutely. So doesn't it – doesn't all that sort of – so my point is you don't want to just isolate this promise from all the other things that are connected to his taking the stand, because they're all maybe in this situation the only thing he really had to put forth. Your Honor, when you look at this case, and it's important that everything be observed here in proper context, counsel knew that the DNA was coming in before that jury was ever selected. Right. He knew that that statement was coming in before that jury was ever selected. And if he had even a little knowledge of the law, he knew that only Mr. Everhart could decide whether to take the stand. So if he's going to get up in front of that jury – or possibly consent. Ultimately it turned into a reasonable doubt. Okay, all right. Because when you compare – But generally speaking, wasn't that what the lawyer, in consultation with his client, was left with? We're either going to have a consent defense here or we're going to have reasonable doubt. Your Honor, I could accept that kind of analysis, but for one fact, I think it's an absolutely critical factor. Okay. Is that later on when you get into it, and the state – defense counsel talked him out of testifying? Well, where do we get that? He was twice questioned by the judge that he had agreed that he had consulted with his lawyer, but in the end it was his decision and he was not going to testify. And isn't that what the cases all suggest, that it should be clear that it is indeed the defendant's choice? I'm not disputing that it's the defendant's choice. You suggested he was forced into not testifying. Not forced into it. I'm saying that we're talking about counsel here. Did he perform competently? Okay. And according to counsel, he said, we have spoken to our client at length regarding the evidence to be presented in our case in chief based on our assessment of this case, our correspondence with our client. We've advised him not to testify in this matter. If that's the case, if he's made that decision, and there wasn't any surprise in the evidence here. He knew all this evidence before opening statement. Yeah, but if the lawyer advised him not to testify, how can we say that that was unreasonable? Because if he's going to advise him not to testify, you don't take the risk going in and making a promise to the jury of such importance. I mean, it's virtually the entirety of his opening statement. All the cases say that when the fillers present the promise testimony, it cannot be chalked up to unforeseeable events. The attorney's broken promise may be unreasonable. For little is more damaging than the fail to produce important evidence. Yes, ma'am. There's plenty of cases out there that say, you know, when you get up and say you're going to hear from the defendant or you're going to hear from these witnesses, and then you don't do that, that that looks bad. No question. But don't they say that if you can't chalk it up to the unforeseeable events. Now, what about this woman? She hadn't testified. Do they know how she's going to come off on the stand? Maybe she came off, you know, extremely credible. Well, let me be clear. Are you talking about DR, the victim here, or are you talking about the victim in the prior case when you say this woman? The victim. No, I'm talking about the victim in this case. Okay. All right. I just want to make sure we're clear. So, I mean, no one knows how she's going to come off until she actually testifies. So, I mean, she apparently came off well. The jury did convict him. Isn't there an argument there that things went south once she testified? I don't think so, Your Honor. I don't think that's the way you can read this for several reasons. But, first, if that's the case, there's no requirement that he make this promise in the first place. If he doesn't know how she's going to testify, then don't make the promise. Ask the jury, as lawyers do all the time in opening statements, don't make up your mind until you've heard all the evidence. Or alternatively, go back to your earlier question. Well, but before you do that, Counsel, let me ask you this. Are you, because of your position about how the fact that he changed his mind or the fact that he counseled his client not to testify after promising the jury that he would testify, you seem to be suggesting that once the promise is made, the promise must be kept, and you wonder whether we wouldn't be here now arguing about Counsel's ineffectiveness for allowing his client to testify had he, in fact, turned out to be a horrible witness, which, you know, he might have been. And the question is, doesn't Counsel have the right exercise of reasonable judgment down the line or at the point where he has to make a decision to change his mind or to change his position and say, you know, I told the jury you're going to testify, but I think that the evidence is simply, or that I don't think you could handle it, or I don't think the evidence, you know, the situation has changed such that I don't think you should testify. It's up to you, but that's my position now. I mean, can't that happen? Can it happen, yes, but I don't think that's what happened here. Let me give you kind of a layered response. Hold it. If you say it didn't happen here, what you're really saying is that Counsel put forth that promise without giving any real thought to the promise and then really thought about it later on. That's a hard position to take to be able to support it. I don't think so, and I don't think so because of the peculiar facts of this case. As I said, if you're going to make that kind of promise, you check with your client. He's either going to say yes, no, or I'm not sure. If it's yes, I'm going to take the stand. What if the defendant tells him I want to put on my defense and I want to testify and I want to tell the jurors that this was consensual? What is the lawyer supposed to do with that? If he's sure that this guy is locked in and he's going to do that, then he can go ahead and make that promise. I'm not saying that he can't after consulting with his client. How do we know that that didn't happen in this case? Because the record shows that he went back to his client. It's not that his client decided initially and told him, I'm going to take the stand, and then decided to change courses according to this record from what the attorney told the court. I talked about it. I told him. We counseled him. We corresponded. We told him not to testify. Now, to get back to your Blagojevich question, what happened in that case? Counsel stepped up. Counsel tried to take the stand. Counsel went to that same jury and said, I made a promise, and that promise wasn't fulfilled. Don't hold my client. But is that the standard that you're saying must be met in every case like this? I'm not saying in every case. Or is the failure to stand up to the jury and admit mistake amounts to ineffectiveness if you don't? When you go in front of the jury at the very beginning, when you know that you're going to be confronted with DNA evidence that I think was one out of 9.5 quadrillion, you've got to look it up, it's a one followed by 15 zeros. I don't think we have a trillion people on the planet. Yeah. I think it's way beyond trillion. But beyond that, you know that DNA evidence is coming in. You know this jury is going to be hearing perpetually because there's a pretrial motion on that. You know that's coming. You know his statement is coming in because there's a pretrial motion on that. All this stuff is coming in. You give them a four-page opening statement that basically says it's consent. All right. It's consent by clients. Do you have to establish prejudice? Let's get right to that one. Do you have to show prejudice here? For an ineffectiveness, it's a second problem. Absolutely. All right. So how do you show prejudice when you have the victim who apparently, if you read the record, it doesn't come off like she was inconsistent. Then you have the propensity. You have the DNA. You have this gun lookalike lighter that I know you're contesting its admission. You have all that. How do you show prejudice here? That if he testified and said, I knew her, and we had sex before, and that wasn't – you didn't really say what he was going to say. But let's assume he said that. Do you think there's a reasonable probability that the jury – I think it changes everything here because counsel has no credibility left in front of this jury. They're just going to tune him out. He made the most crucial promise he could make in a criminal case involving sex where the only possible witnesses are the complainant and the defendant. But you have to show – forgetting about the lawyer. You know, we really aren't – you have to show that if the defendant testified, that somehow this would have changed the outcome. Don't you have to show that? Isn't that what the prejudice model is? I think that's – So say the jury is lost on the lawyer. Have you shown in this record that there's a reasonable probability the jury would have found him not guilty and they would have bought into the consent defense? There were – you asked in a previous question whether this witness just came off spectacularly. And if you look at – I'm not saying she did. I'm saying that perhaps going through her testimony, that's how she appeared to the jury. I don't know. Well, according to defense counsel's closing argument, that's not how she appeared to the jury. He noted a number of things where there were contradictions, whether her pants were up or down when she went to the woods, whether she made the immediate complaint on the phone, a variety of things that she could have told the police officer when he came to interview her and did not mention to her. And the officer testified, no, I wasn't told those things as well. So it was a full-blown attack on her credibility. And to make that kind of attack, when you've started out by teaching the jury basically, don't believe everything I say, it's just contradictory. The jury can't give much credence to counsel's argument at that point. And it's the only argument now on closing that has. Where is the prejudice? What would change the outcome in this case? If he doesn't make that promise in the first place, if this opening statement, he's not sure if he's going to testify or whatever, give an opening statement in conformity with your closing argument. So when you step up to the jury at the end, when you've isolated all these things. Let's assume that everything he did is wrong. I agree with you. It's wrong. But where's the prejudice? What would change the outcome? The evidence is overwhelming here. In other words, had he made an opening statement that you were to don't reach a conclusion, wait until all the evidence comes in, because I can't think of anything else he would have said. If you throw out consent, without consent, I don't know what the defense is. Reasonable doubt? DNA? Propensity evidence? A statement? Your Honor, that almost begs the next question. If that's the thing, he knows, he looked at this at the beginning, he said the only way we can beat this is proving consent. Why is he trying to talk his client out of testifying? Because that's what the record says he did. Well, I don't know when and at what point in time he tried to convince him not to testify. But don't forget, it's deficient representation is clear. Let's take that. And that's what Justice McBride is trying to point out as well. That is prejudice. Where is prejudice? Because I think if counsel has credibility, that counsel can make these arguments based on her version of events, that you just can't believe this occurred. You can't believe that this occurred in this way. And at that point, it may open the door, even without his testimony, say, you know, that DNA, okay. And the argument he made in summation is the DNA was also there. You know, they didn't test the DNA that was found on the ground. There was a cigarette butt that was allegedly collected. They didn't test that. There was DNA on the record. But did they need to test that? Did they need to? Did they have sufficient enough DNA from her panties? The panties and the baton were tested. I mean, that's enough. Why do you need more? Well, Your Honor, the point here is the fact that the other stuff wasn't tested and there was rectal DNA might induce some reasonable doubt in the jury that there's some other sexual contact that this woman engaged in, and maybe there's some other explanation that they're not getting. Mr. Hirshhorn, I don't recall whether you had another issue that you wanted to address as well. I want to touch on propensity evidence as well here, because in addition to going here with a jury that basically learns through the course of the trial that this attorney has a propensity to mislead them, they also know going in that this jury is going to learn, this jury is going to be told that this man has a prior aggravated criminal sexual assault conviction on his record. And this all comes in under 115-7.3, the exception to the bar on propensity evidence, isolated strictly to specified sexual offenses, under the theory as stated by the Supreme Court in Donahoe that sexual offenders tend to recommit far more than other offenders. That's the logic that's pursued here. That's the logic behind the statute. But the Supreme Court in Donahoe also cautioned that you have to engage in a prejudice versus probative value, and the statute itself tells us what factors we should look at when we're analyzing probative value. The first one they list is temporal proximity, and we're talking about one offense that occurred in 1994, I believe. We have a standard, we have a time frame that we should take into account when we're talking about impeaching prior convictions, and that's the Montgomery standard. Yes, 10 years. And that's 10 years. And did this... I think this was just outside the 10 years. I'm not so sure, because, in fact, if he... We're talking about the release from... Okay, if you're including the time while incarcerated, yes, I understand. I think it's one thing when you're talking about use of prior convictions which are introduced for a limited purpose, only if the defendant takes a stand to assess his credibility and the jury gets a limiting instruction telling them that's the only thing you can consider it for. Do you get a limiting instruction on propensity evidence? You get an instruction here, but from a defense perspective, this isn't limiting. Quite honestly, I have a real difficulty understanding any limitation on propensity. Propensity includes identification, it includes motive, it includes virtually every possible reason to introduce that prior conviction, and there's no limitation available as far as I can tell. Well, when I look at this, and, again, fortunately for me in this sense, the rule is that propensity is out unless it fits under this statute. But when you look at this from that perspective, let's recall that, one, it's here strictly sexual propensity. Two, we're talking about an offense that's more than 10 years. I think it's 10 1⁄2 years or almost 11 years difference between one and the other. And we're talking about two events. I mean, one event is an instance and it's an event. Two could be a coincidence. I don't think you can reach a pattern until you get three. But let's look at this objective. Let's talk about the temporal element. We addressed this somewhat in the reply brief. It's one thing if you have a guy who's arrested, incarcerated, and within a year of his release he's out doing it again. Here, even under the state scenario, you've got a guy who's arrested, he's incarcerated, and six years go by before there's a second event. That's not a tendency. That's not a propensity. I've looked up propensity. What standard of review? Our standard of review is abuse of discretion. It's abuse of discretion, and now we're getting into the other factors listed in the statute, and I don't want to belabor the point. We addressed these at length in the briefs here. But we're talking about a 20-year-old victim in the 1994. We're talking about a 39-year-old victim here. We're talking about a digital penetration of the 1994. We're talking about penis-to-vaginal contact in this one. Wasn't it a bit unusual as well to have the motion reconsider, go back to the same judge who ruled on the motion, as opposed to the trial judge who's going to actually hear the case and decide what evidence should come in and should not come in, and maybe this should fall under that sort of ruling by her? Well, Your Honor, based on prior experience on the civil side, I'm recalling a lot of cases that kind of frowned on forum shopping, and I'm wondering if that might have played some part. It's not forum shopping because the case got assigned to Judge Simmons, and it wasn't before Judge Panitchi. I don't know where that one turns out. Frankly, if I were Judge Simmons in this case, I would have said the case is before me now. I'll rule on this. And how often do judges really reconsider prior decisions? It's tough enough making the decision once. Yeah, it's asking a circuit court judge to serve as a one-judge appellate panel. And I think that's difficult for any judge. When did it go back the second time to reconsider? I think it was shortly before trial, after the case had been assigned to Judge Simmons. Okay. It wasn't during the trial itself? No, no. It wasn't like renewed just before she was going to testify? I'm going on some foggy recollection here. I believe this was part of the immediate run-up to trial where there were a number of pre-trial motions eliminated and things of that nature, and one of them was a motion to reconsider the admission of that. I could be wrong on that, but that's my recollection at this point. But in any event, Your Honor, I think when you look at this, you look at this through the prism of Donahoe that's talking about this is sexual offenses, so let's look at the sexual similarities of these to see if we have some kind of propensity. Almost all the sexual components here are different. Digital versus PS Vaginal, the age of the victim, 20 versus 39. It's almost twice as long. One is accompanied by a carjacking. This one was allegedly accompanied by an armed robbery, although those charges were dropped. The sexual component that makes this propensity evidence admissible, that's the part that's different. What sort of analysis do we perform if we say no on the ineffectiveness but yes on the propensity and we have to look at prejudice? And then the main case that you rely on, Justice Wolfson's case, I forget the name of it, I mean they rule that it should not have been admitted but in the end affirmed the conviction. Well, let's remember one additional fact, and this is the oddball that's in this case. It's because the propensity evidence came in in this case that his trial attorney had to go, Mr. Parchin. This is something you don't find in all those other cases. He's got a relationship with this attorney. This attorney was appointed for him. They had established a relationship. He worked with him. He was willing to waive any conflict. He wanted Mr. Parchin to handle this trial. And the trial judge initially denied the motion to disqualify him because he hadn't made a decision on whether or not this prior offense was coming in. He was not gone until the decision was made that this offense is coming in. At that point, now he's got to step out. So there's an additional element of prejudice here that's not present in those cases, and that makes this one, again, it's kind of a one-off, and I doubt that that's the kind of scenario that's going to be repeated. Would it be a little more difficult for us if counsel had not agreed to withdraw, had not agreed to say, yes, there is a conflict here and I'm withdrawing, because had he said, I'm staying in so long as my client is willing to waive any conflict, I'm staying in, I'm going to represent him? I don't want you to use the word agreed. I want you to use the phrase falling on his sword here. He wanted to be there. He was willing to do it. The client was willing to waive any conflict. This was not something that he woke up and said, you know, I've got to get myself out of this one. This is one where it was forced on him. He didn't so much wake up and walk into court and say, you know, I'm thinking about this, I've got to withdraw. He walked in and he was housed in. All right. We're going to save you a couple minutes. Okay. Thank you very much. Thank you. May I please report? Assistant State's Attorney Stacia Weber on behalf of the people of the State of Illinois. For an ineffective assistance of counsel review, you have to presume incompetence. Defendant wants you to presume that a lie was told. That's not the evidence on the record and that's not the right evaluation under Strickland. This court has already addressed this very same issue in Manning and determined that without evidence on the record as to why defendant didn't testify, it cannot be addressed on direct appeal. This is appropriate for a post-conviction appeal, not direct appeal. Issues are exactly the same as in Manning. Just as in Manning, defense counsel promised that defendant would testify, just as in Manning, defense counsel here didn't put forth any evidence of an affirmative defense. Just as in Manning, defendant stated on the record that it was his choice, his call. Did they say in Manning, did defense counsel say in Manning that I encouraged my client not to testify? It didn't. And I think that that is a stretch in this case that he encouraged his counsel not to testify. After the people arrested, defense counsel said, we have spoken to our client at length regarding the evidence to be presented in our case in chief. Based on our assessment of the case, our correspondence with our client, we have advised him not to testify in this matter. And then he was admonished multiple times by the trust. When was that said that they had advised him not to testify? This was said immediately after the people arrested. Well, what would be the point then of this lawyer giving these remarks in opening statements, that you're going to hear this is really a consent case, there was sexual conduct, he had met this woman before, and he's going to explain the statement that he gave? What was the point of all that? If defendant had discussed this case with his client, if defendant and defense counsel had discussed this case, and defendant initially said, I'm going to testify, we had consensual sex, defense counsel was absolutely within his rights to promise that based on what defendant wanted. Again, the only thing from the- But in Manning, we pointed out that the defendant did not allege that counsel advised him not to testify. In Manning- Here, there's a section on the record where he says, we've advised him not to testify. In Manning, he specifically did reference that he had discussed it with counsel, that it was his decision along with counsel's advice that he wasn't going to testify. So in both cases, you have defense counsel's advice. Who knows why he gave that advice? That's not on the record. That's why this issue cannot be addressed on direct appeal. Should the trial judge at that point have reminded the defendant that you understand that your client- I mean, your attorney has promised the jury that you would testify, and you're still persisting in your decision not to testify? The trial court here went over and over that this was defense counsel's choice. Could he have said, you know, you've already promised the jury, sure, but there's no obligation that he has to, and there's no obligation that defense counsel needs to put on the record the reason. That invades into attorney-client privilege. It invades into defense strategy. What about propensity? Propensity. I mean, what real limitation is there to prevent a judge from exercising its discretion and admitting propensity every single case? The limit is that it has to be-he has to go through these factors. It has to be temporally proximate. He has to go- How is it temporally proximate in this case? In this case, the attacks occurred ten years and three months apart. So what sort of outer limit is there to this temporal proximity? Donahoe declined to draw a bright line, but they did allow-in that case, there was a 12-to-15-year difference. How do we apply that limitation? What guidelines are we to say that this one went-this is too old or this one is okay? Ten years seems like a good cutoff line. Why shouldn't we just apply ten years? That is at the judge's discretion, but that is not what Donahoe-Donahoe, the Supreme Court of this state- Well, this would fit into the ten years anyway, wouldn't it? He was released- It happened six years after he was released, a little less than six years after he was released. So it absolutely is within the time frame addressed in Donahoe. There were substantial circumstantial similarities. Both attacks happened in the early morning between 12 and 3 a.m. Both women were attacked from behind in a parking lot. Both women had what- Do you think that most-I don't know, but do you think most sexual assaults occur in the early morning hours, between 12 and 3 a.m. maybe? I have no idea of the statistic of that, but that is something- But you think that's a distinguishing feature in this case? I think that it is, yes. Well, is it distinguishing or is it a similarity? I'm sorry. It's a similarity in this case. And how do you view-how would you capsulize abuse of discretion? That's how we're reviewing this, aren't we? Yes. The judge said she was weighing the factors. No reasonable judge could have found this way. These are not factors for this court to re-weigh, to re-address. But she did take each one and talked about it. She did.  Well, when it's she, it's not really she. It's a he. Oh, I'm sorry. The actor spoke. It was Judge Benici. Judge Benici. And was it your office? Was it your office that got the motion to get back to Judge Benici, as opposed to having it heard by the trial judge that had been assigned the case, that would rule on all the evidentiary matters that come up during the course of the trial, very similarly to this? Judge Simmons? Are you talking about the motion for reconsideration? Reconsideration. How did it get back to Judge Benici? Did Judge Simmons send it back, or did your office ask that it be sent back? I don't recall who sent it back. But Judge Benici did go through each of these factors and noted that he re-read the arguments, he re-read the case law, and he assessed the prejudicial impact of the admission of this prior crime against the probative value. He did everything that the statute requires. And it was not an abuse of discretion. I thought he didn't mention prejudice. He did mention it? He assessed the prejudicial impact against the probative value on the record 188 to 191. All right. When he was going through this. So if there are no further questions for these reasons and those, I'll maintain on a brief. We ask that you affirm defendant's conviction. All right. Thank you very much. Thank you. Very brief. I'll be as quick as I can here. Just a couple of very brief points. One with reference to Manning. I did want to quote what I think is a key sentence in Manning. We cannot determine from the record presented whether counsel's decision to abandon the defense of necessity was due to defendant's choice not to testify sound strategy or incompetence. That's what happened in that case. In this case, by contrast, we have defense counsel himself saying, I talked him out of it. What was absent and the reason that the Manning court decided that it couldn't be decided there, is that that gap is filled in here. We know that defense counsel talked him in and told him not to testify. Second thing, and again, I can't emphasize this enough. You can't unring this bell. This is big. Counsel told them defendant's going to raise that right hand, take an oath to tell the truth, and he's going to call this consensual, he's going to tell them they had a history, this isn't the first time this has happened with these two people, and he's going to explain his statement, not what you're going to hear from the police. He told the jury all these things and he couldn't fulfill any of these promises. He had no credibility left when it came to closing argument. When he decided, under your honor's scenario, to switch strategies based on what happened during the course of trial, he lost that opportunity by making a promise and costing himself his own credibility. And finally, the last point here, the reference was made to Donahoe and the gap in time in Donahoe. In Donahoe, we were talking about sexual contact with children. It was the overwhelming sexual similarity of the offenses that allowed you to call it propensity there. The temporal difference in Donahoe was kind of the subtext, not the major thing. There was an overwhelming similarity there. Here you've got this long temporal gap, you've only got two events, and you have two offenses that are not sexually similar. I don't see how that gets you to propensity. Propensity, when I looked it up, was defined as an innate or natural inclination or tendency. I don't know how you get there with these two events over ten years apart involving different kinds of sexual contact. Unless there are any further questions. Let me ask you a question about Donahoe. Donahoe, the trial judge, allowed the evidence regarding similar events, contact, that the defendant had. The appellate court reversed, as I recall. Do you recall? Do you know the case? Certainly. I've read the Supreme Court's decision. Oh, but not the appellate court. My recollection is that the appellate court reversed, and it found that the propensity elements of the statute had not been met. And it goes to the Supreme Court, and the Supreme Court reverses the appellate court. And yet the Supreme Court, in the course of reversing the appellate court, cautions trial judges not to apply this statute too broadly. It seemed to me that if they didn't want it applied too broadly. I'm not going to even attempt to probe the thought process that led to that, Your Honor. But what I would say is I think, again, and I want to emphasize to you, it's the similarity in the sexual components of the offenses that dictated the result that was reached in Donahoe. And those similarities just simply aren't here. To say that, well, the victims were female, okay, where's the limitation in that? Those similarities just don't exist here. And because of that, I don't see how you can call this propensity evidence that should have been admitted. All right. Well, thank you very much. The case will be taken under advisory. Thank you very much, Your Honor. Court is in recess.